IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

Plaintiff,

v.

LEONARD GONZALEZ-SEDA,

Defendant.

CRIMINAL NO. 15-440 (FAB)

**REPORT AND RECOMMENDATION**

**INTRODUCTION**

On July 8, 2015, a federal Grand Jury returned a four count Indictment against defendant Leonard González-Seda ("González-Seda") for possession with intent to distribute a detectable amount of marihuana, in violation of Title 21, United States Code, Section 841(a)(1) and 841(b)(1)(B); possession of a firearm in furtherance of a drug trafficking offense, in violation of Title 18, United States Code, Section 924(c)(1)(A); prohibited person in possession of a firearm (convicted felon), in violation of Title 18, United States Code, Section 922(g)(1) and Section 924(a)(2); and possession of a firearm with an obliterated serial number, in violation of Title 18, United States Code, Section 922(k). (Docket No. 6).

On October 8, 2015, González-Seda filed a "Motion to Suppress Evidence Obtained without Probable Cause" moving the court to suppress all statements and incriminating evidence seized during his warrantless arrest, search of his vehicle and his subsequent statements to law enforcement agents because: 1) the traffic stop lacked probable cause and Defendant's subsequent detention, arrest, questioning and search were fruits of the illegal intervention; 2) the warrantless K-9 inspection conducted after Defendant's arrest

also lacked probable cause because the K-9 was unreliable; and 3) the destructive search of Defendant's vehicle was unreasonable in light of the limited administrative authority to do an inventory search of the vehicle, even if consent to do an ordinary search was taken as valid.   (Docket No. 54).

On November 2, 2015, the Government filed its "Response in Opposition to Defendant's Motion to Suppress Evidence and Statements" claiming the Motion to Suppress should be denied for the following reasons: 1) law enforcement officers had probable cause to make the traffic stop; 2) the K-9 inspection did not require a warrant; 3) the search of the vehicle was reasonable and lawful under the automobile exception doctrine; and 4) Defendant expressly consented to the search of his vehicle.   (Docket No. 76).

On March 1, 2016, the suppression hearing started with the direct and cross-examination of PRPO Roberto Beauchamp-Rodríguez ("PRPO Beauchamp") on behalf of the Government. Defendant then called Héctor Rosado-Santiago ("Rosado-Santiago") to the witness stand.   Direct and cross-examination conducted. The Government then called HSI TFO Allen Ortiz-Rivera ("TFO Ortiz-Rivera") as a rebuttal witness. Direct and cross-examination conducted. Several documents from both parties were admitted into evidence. Some of the exhibits were admitted subject to translations being provided. (Docket No. 90).[1]

---

[1] All translations were eventually submitted by both parties.

On April 5, 2016, the suppression hearing continued with the direct and cross-examination of PRPO Eliseo López-Resto ("PRPO López-Resto") on behalf of the Government. One additional exhibit was admitted into evidence, pending its translation. Defendant González-Seda then briefly testified on his own behalf.   Prior to Defendant's testimony, he was advised by defense counsel and the undersigned of the possible consequences of testifying at this stage of the proceedings. Direct and cross-examination conducted.   Oral arguments were then heard on behalf of both parties. (Docket No. 98).

## LEGAL DISCUSSION

### A.    Investigatory Stop based on Reasonable Suspicion.

The issue of whether the stop of Defendant González-Seda's vehicle was legal and based on reasonable suspicion, as required by Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868 (1968), is first addressed.[2]

Defendant González-Seda claims in his Motion to Suppress that the initial stop of his vehicle lacked probable cause. Defendant posits that the officers of the Puerto Rico Police Department ("PRPD") made a baseless traffic stop that was a subterfuge for an illegal intervention and subsequent interrogation and search.   Defendant claims that it was physically impossible for the PRPD officers to have seen at 4:10 am, from a moving

---

[2] It is noted that neither Defendant nor the government properly addressed whether the initial stop of the vehicle was valid under the reasonable suspicion standard under Terry. Both parties refer to probable cause being required to make the traffic stop and conduct the subsequent arrest. However, only reasonable suspicion was necessary under Terry for the initial stop of the vehicle.

identified patrol vehicle, that Defendant was not wearing his seat belt.   (Docket No. 54, p. 5).

The Government counters by arguing that Defendant's traffic violation for not wearing his seat belt was enough probable cause to support a traffic stop and consequently a valid arrest.   (Docket No. 76, p. 5).

An investigative stop, also known as a Terry stop, *see* Terry v. Ohio, 392 U.S. at 1, occurs when a police officer, acting on reasonable and articulable suspicion of criminal activity, briefly detains an individual to confirm or dispel his suspicion.   *Id.* at 6, 88 S.Ct. 1868 (citing United States v. McCarthy, 77 F.3d 522, 529 (1st Cir. 1996)).

With regards to investigative stops, the Court must determine "not whether the police had probable cause to act, but instead whether the actions taken were reasonable under the circumstances." *Id.*   The Court must first conclude whether the officer's action was justified at its inception. If the action is justified, the Court must then ask whether the action taken was reasonably related in scope to the circumstances which justified the interference. *Id.* To satisfy the first prong, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." United States v. Young, 105 F.3d 1, 7 (1st Cir. 1997) (*citing* United States v. Kimball, 25 F.3d 1, 6 (1st Cir. 1994)).   To fulfill the second prong, the Court must examine the totality of the circumstances.   *See* United States v. Walker, 924 F.2d 1, 4 (1st Cir. 1991); United States v. Acosta-Colón, 157 F.3d 9, 14 (1st Cir. 1998).

Pursuant to the testimony of PRPO Beauchamp at the suppression hearing, on July 5, 2015, he started his shift at 1:00 am.   PRPO Beauchamp was part of a work plan which was going to be performed at Road #1 because there had been incidents of shots being fired in the area at that time.   On that night, PRPO Beauchamp was driving on Road #1, in the direction from Guaynabo to Caguas, in a marked police patrol vehicle, along with fellow officer PRPO Alvin Rivera.   At 4:00 am, when they were close to El Tequilón de Alex (a business establishment), several traffic lights prior to Restaurant El Cantinflas, PRPO Beauchamp observed a burgundy Toyota Corolla, four doors, exiting El Tequilón de Alex heading to Caguas.   When the Toyota Corolla got to Road #1, it started cruising in the right lane. PRPO Beauchamp's patrol car was cruising on the left lane when he observed that the driver of the Toyota Corolla was not wearing his seat belt. The vehicles were moving at the time and the area was illuminated by the light posts on the edge of the road and the lights of top of the patrol car.   PRPO Beauchamp testified that, even though there was not a lot of illumination, the windows of the patrol car were not tinted and the tint of the windows of the Toyota Corolla was not dark. *See* Exhibit 6A. The windows of the Toyota Corolla were up.   PRPO Beauchamp saw two occupants inside the Toyota Corolla.   PRPO Beauchamp's patrol car let the Toyota Corolla pass the patrol car to observe its license plate.   Then, the patrol car followed the Toyota Corolla until it reached a safe area (once they passed Restaurant El Cantinflas) where the PRPD officers intervened with the Toyota Corolla.

United States of America v. Leonard González-Seda
Report and Recommendation
Cr. No. 15-440 (FAB)
Page 6

_____

Based on the uncontested testimony of PRPO Beauchamp, he observed the driver of the Toyota Corolla vehicle (later identified as Defendant González-Seda) without a seat belt, a traffic violation which provided reasonable suspicion for the initial stop of the vehicle.[3] *See* United States v. Tiru-Plaza, 766 F.3d 111, 119 (1st Cir. 2014) (The Court of Appeals for the First Circuit agreed with the district court's determination that the traffic infraction was sufficient to justify the initial stop); Whren v. United States, 517 U.S. 806, 819, 116 S.Ct. 1769 (1996) ("[T]he officers had probable cause to believe that petitioners had violated the traffic code. That rendered the stop reasonable under the Fourth Amendment...."); United States v. McGregor, 650 F.3d 813, 820 (1st Cir. 2011) ("An officer can stop a car if he sees a driver commit a traffic offense, even if the stop is just an excuse to investigate something else."); United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001) ("[T]he appellant does not question the legitimacy of the initial detention: [the officer] clearly had cause to stop him for tailgating and operating an automobile equipped with blue-tinted lights.").

In sum, after observing the traffic violation, the officers had reasonable suspicion to stop the Toyota Corolla vehicle and their action was justified at its inception. Thus, under the totality of the circumstances and based on the personal observations of the PRPD officers, they had reasonable, articulable suspicion about Defendant's involvement in some criminal activity.   Thus, the initial stop of Defendant González-Seda was valid and within the parameters of Terry, 392 U.S. at 21 and Chhien, 266 F.3d at 6.

_____

[3] See Exhibit 4 which is the traffic violation which was issued to Defendant for failure to wear his seat belt.

### B.      Warrantless Arrest.

A warrantless arrest is constitutionally valid if, at moment the arrest is made, officers have probable cause to make it, that is, if at that moment facts and circumstances within their knowledge and of which they had reasonably trustworthy information are sufficient to warrant a prudent man in believing that the arrestee had committed or was committing an offense.     United States v. Ayres, 725 F.2d 806 (1st Cir. 1984); Young, 105 F.3d at 6 (same).    Whether there is probable cause for a warrantless arrest is determined under an objective standard, not by inquiry into officers' presumed motives. Id.

Probable cause "is a practical, nontechnical conception" offering an acceptable compromise between competing societal interests in protecting citizens on the one hand from abusive interferences with privacy and unfounded charges of crime and on the other hand in recognizing the necessity to afford 'fair leeway for enforcing the law in the community's protection.'"     Brinegar v. United States, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311 (1949).

A warrantless arrest requires probable cause, the existence of which must be determined in light of the information that law enforcement officials possessed at the time of the arrest.    See United States v. Diallo, 29 F.3d 23, 25 (1st Cir. 1994).

To establish probable cause, the Government "need not present the quantum of proof necessary to convict." United States v. Uricoechea-Casallas, 946 F.2d 162, 165 (1st Cir. 1991); United States v. Meade, 110 F.3d 190, 193 (1st Cir. 1997). The inquiry into probable cause focuses on what the officer knew at the time of the arrest, United States v.

Brown, 169 F.3d 89, 91 (1st Cir. 1999) and should evaluate the totality of the circumstances. United States v. Reyes, 225 F.3d 71, 75 (1st Cir. 2000). "[P]robable cause is a common sense, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Meade, 110 F.3d at 198 n. 11; United States v. Vongkaysone, 434 F.3d 68, 73 (1st Cir. 2006).

It is unquestioned that when a defendant is arrested he may be searched both for evidence of his crimes and for the safety of the officers. "It is also well established that the defendant's lawful arrest permits the police to search his person . . ." United States v. Fiasconaro, 315 F.3d 28, 37 (1st Cir. 2002); United States v. Doward, 41 F.3d 789, 792-93 (1st Cir. 1994). "[I]t is settled beyond peradventure that a search of an individual's person made incident to a valid arrest is itself valid, despite the absence of an arrest warrant." United States v. Winchenbach, 197 F.3d 548, 552 (1st Cir. 1999).

After hearing the testimony of PRPO Beauchamp during the suppression hearing, as to Defendant's initial stop and his arrest, and assessing his credibility, the Court credits his testimony inasmuch as the defense did not present any evidence as to how Defendant's arrest occurred. Defendant's testimony, and that of his only other witness, were very limited in scope and did not contradict the version of facts provided by PRPO Beauchamp as to how Defendant's warrantless arrest took place.

PRPO Beauchamp testified that, after the Toyota Corolla stopped, he parked the patrol car at a prudent distance.   PRPO Beauchamp started walking to the driver's side

of the Toyota Corolla and he observed Defendant González-Seda (the driver) making a movement like straightening up and facing forward.    PRPO Beauchamp was at about 4-5 feet from the trunk of the vehicle.    Once PRPO Beauchamp saw the movement, he heard as if something hard (like metal) fell.    Then, PRPO Beauchamp continued walking and he got to the rear door of the driver's side and he heard a noise of something closing, like a compression or buzz, something hydraulic. Defendant then lowered his window and PRPO Beauchamp asked for Defendant's license and the vehicle's registration. Defendant's driver's license was up to date.    However, PRPO Beauchamp observed that the Toyota Corolla was registered under a female's name.    Defendant told PRPO Beauchamp that the female, under whose name the vehicle was registered, was his wife. PRPO Beauchamp asked Defendant what he had in the back of the vehicle because he had heard a noise.    Defendant answered that he did not have anything. PRPO Beauchamp asked Defendant again and he said he only had a backpack.    Then, Defendant turned backwards, took the backpack and handed it to PRPO Beauchamp.    PRPO Beauchamp asked what was inside the backpack and Defendant said there was nothing, just personal stuff, and marihuana because he was a marihuana user. PRPO Beauchamp then opened the backpack and observed several plastic transparent baggies and one pill bottle with what PRPO Beauchamp believed was marihuana shavings, as per his experience.[4]    The baggies were later counted and they turned out to be 13 baggies.

---

[4] PRPO Beauchamp testified he has been a police officer for 14 years.

Exhibit 1 is a photograph of the backpack with military print that Defendant handed to PRPO Beauchamp.

PRPO Beauchamp testified that, after he saw the marihuana inside the backpack, he asked Defendant to get out of the vehicle and informed him that he was under arrest for a controlled substances violation.    PRPO Beauchamp read to Defendant his Miranda rights when he was getting out of the vehicle. Once outside the vehicle, PRPO Beauchamp asked Defendant whether he had anything else illegal inside the vehicle.    Defendant answered that there was nothing else illegal inside the vehicle and if he (PRPO Beauchamp) wished he could check the vehicle.    When PRPO Beauchamp was going to put Defendant in handcuffs, Defendant opened the rear driver door for PRPO Beauchamp to see the inside of the vehicle. PRPO Beauchamp allowed Defendant to open the door of the vehicle because Defendant was in front of him and PRPO Beauchamp was in total control. PRPO Beauchamp then placed Defendant in handcuffs. PRPO Beauchamp did not observe anything else illegal in plain view in the rear of the vehicle.

The Court recognizes that PRPO Beauchamp's testimony as to hearing a metal sound after Defendant straightened up and also hearing a compression hydraulic sound, as if something was closing, is highly unbelievable.    That is so because the initial stop of the Toyota Corolla was in Road #1 at 4:00 am, which is an open, noisy road through which many trucks travel. Moreover, PRPO Beauchamp was 4-5 feet away from the Toyota Corolla when he allegedly heard the first noise, of the alleged metal hitting something, and at about 2-3 feet from the trunk of the vehicle when he heard the second hydraulic

noise, as he admitted during his cross-examination. Finally, PRPO Beauchamp admitted during his cross-examination that no metal item was found inside Defendant's backpack; the backpack did not have any metal parts; and no metal items were found in the Toyota Corolla's back seat. Unless PRPO Beauchamp has "bionic" hearing, his hearing capabilities seem unbelievable.

However, even disregarding the two noises allegedly heard by PRPO Beauchamp, there are enough grounds for him and his colleague to have determined that they had probable cause to arrest Defendant González-Seda on that day.

PRPO Beauchamp's testimony as to Defendant's arrest is uncontested. The testimony given by Defendant was limited to no K-9 allegedly being present after the original intervention in Road #1 the day of his arrest. Defendant did not testify whatsoever as to how his arrest that night occurred. More importantly, Defendant did not deny that he voluntarily handed the backpack to the police officers nor that he invited the officers to search the Toyota vehicle if they wished to do so, as testified by PRPO Beauchamp.

The testimony of Defendant's only other witness, Rosado-Santiago, did not contradict PRPO's Beauchamp as to how Defendant's arrest transpired. Rosado-Santiago testified he was sharing with Defendant at Tequilón de Alex and asked him for a lift home. Rosado-Santiago was with Defendant in the Toyota Corolla vehicle when it was stopped by the police.   Rosado-Santiago testified on direct examination that he did not recall if they were wearing seat belts that night. Rosado-Santiago's testimony as to who stopped the Toyota, Defendant handing his license and registration to the officer, the area were

the Toyota Corolla was stopped being illuminated, and how he was arrested is consistent with the testimony of PRPO Beauchamp.

Rosado-Santiago further explained that, when he was arrested, he was taken to the back part of the Toyota Corolla, facing the patrol car. As such, Rosado-Santiago does not have personal knowledge of how Defendant's arrest transpired.   Rosado-Santiago did not remember if Defendant handed a backpack to the police officer.   Rosado-Santiago did not tell a federal agent that there was a backpack in the Toyota.   When Rosado-Santiago was taken to the police station, he saw a backpack that had been opened and the marihuana was outside the backpack.[5]

Pursuant to the evidence before the Court, PRPO Beauchamp had probable cause to arrest Defendant.   PRPO Beauchamp asked Defendant what he had in the back of the vehicle and he answered he did not have anything. PRPO Beauchamp asked Defendant again and he said he only had a backpack.   Then, Defendant turned backwards, took the backpack and voluntarily handed the backpack to PRPO Beauchamp. PRPO Beauchamp asked what was inside the backpack and Defendant said there was nothing, just personal stuff and marihuana because he was a marihuana user. PRPO Beauchamp opened the backpack and observed plastic transparent baggies and one pill bottle with marihuana shavings inside. The baggies were later counted and they were 13.[6]

---

[5] The Government brought TFO Ortiz-Rivera as a rebuttal witness who testified he interviewed Rosado-Santiago. TFO Ortiz-Rivera testified Rosado-Santiago told him there was a bag with marihuana and he had nothing to do with it.

[6] As argued by the Government, it could be reasonably inferred that Defendant's motive for voluntarily handing the backpack with the marihuana inside to the officers was to distract them from finding the hidden compartment with the other illegal items, including the weapons.

In sum, Defendant González-Seda voluntarily handed to PRPO Beauchamp the backpack with the controlled substances inside. No evidence to the contrary was presented at the suppression hearing. Defendant failed to present any evidence that he, for example, was coerced or threatened to give the backpack to PRPO Beauchamp. Defendant took the stand and he did not take that opportunity to disclaim PRPO Beauchamp's version of facts as to how his arrest occurred. Thus, PRPO Beauchamp's testimony is unrebutted.[7]

It is without question that a violation to the controlled substances law provided probable cause to arrest Defendant González-Seda. Moreover, PRPO Beauchamp testified he was part of a work plan which was going to be performed at Road #1 because at that time there had been incidents of shots being fired in the area where Defendant was arrested.[8]

In view of the foregoing, Defendant González-Seda's warrantless arrest was legal and based on probable cause.

## C. Warrantless Search of Defendant's Vehicle.

Defendant González-Seda seeks suppression of all the evidence seized during his warrantless arrest and during the inventory search. Defendant posits that the search of

---

[7] The efforts made by defense counsel in cross-examination to impeach PRPO Beauchamp were not enough to discredit his testimony.

[8] The determination of whether probable cause exists must not rest on isolated facts but depends on the cumulative effect of the facts in the totality of the circumstances. Probability, not a *prima facie* showing of criminal activity, is the standard. Draper v. United States, 358 U.S. 307, 313, 79 S.Ct. 329, 333 (1959). The inquiry into probable cause to support an arrest is not necessarily based upon the offense actually invoked by the arresting officer but upon whether the facts known at the time of arrest objectively provided probable cause to arrest. See United States v. Jones, 432 F.3d 34 (1st Cir. 2005) (*citing* Devenpeck v. Alford, 543 U.S. 146, 125 S.Ct. 588 (2004)).

his vehicle was not valid under Arizona v. Gant, 556 U.S. 332, 347, 129 S.Ct. 1710 (2009). To this effect, Defendant claims the search of his vehicle was not justified as incident to the arrest because he had already been arrested (pursuant to a traffic stop) and he was already outside of the vehicle when it was allegedly searched.   As such, there were no safety concerns for the law enforcement officers that would justify the search of his vehicle without a search warrant.

The Government posits the warrantless search of Defendant's vehicle was valid under the automobile exception to a search warrant.   The Court agrees.

The Fourth Amendment of the United States Constitution prohibits "unreasonable searches and seizures." U.S. Constitution, Amend. IV. This prohibition makes warrantless searches presumptively unreasonable. *See* Groh v. Ramírez, 540 U.S. 551, 559, 124 S.Ct. 1284, 157 (2004).   However, there are exceptions to the warrant requirement to conduct a search and seizure.   *See* Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507 (1967). "One of these exceptions is for items in plain view."   *See*, e.g., United States v. Sánchez, 612 F.3d 1, 45 (1st Cir. 2010). Another exception is known as the "automobile exception" which provides that a search of an automobile without a warrant is justified as long as the search was supported by probable cause that the vehicle contained evidence of illegal activity. Gant, 556 U.S. at 347, 129 S.Ct. at 1710 (discussing how one of the "established exceptions to the warrant requirement" allows a "search of any area of the vehicle" for evidence of criminal activity if "there is probable cause to believe a vehicle contains [such evidence]"); *see also* United States v. Ross, 456 U.S. 798, 809, 102 S.Ct. 2157 (1982) ("In

[the] class of cases [involving the automobile exception], a search is not unreasonable if based on objective facts that would justify the issuance of a warrant, even though a warrant has not actually been obtained.").

Gant has clarified that a vehicle search may fall within the search-incident-to-arrest doctrine only in two very specific situations: (1) "when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search" (the officer-safety justification); **or** (2) "when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle" (the evidence-preservation justification). Gant, *supra,* at 1719 (internal citations and quotations omitted).

Furthermore, the First Circuit Court of Appeals has emphasized that probable cause only requires a "'fair probability that contraband or evidence of a crime [would] be found in a particular place.' " United States v. Woodbury, 511 F.3d 93, 97-98 (1st Cir. 2007) (*citing* Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317 (1983)). This standard of fair probability does not require certainty; rather it requires that an officer "demonstrate that he reasonably believed [that] evidence of a crime would be found" in a particular location. *Id.* at 98.

Defendant González-Seda argues the search-incident-to-arrest exception to the warrant requirement does not apply to his case, because his vehicle was allegedly searched after he had been removed from the vehicle and there was no safety issue for the officers. (Docket No. 54, pp. 7-9).

PRPO Beauchamp testified that, after Defendant willingly gave him his backpack and PRPO Beauchamp saw the marihuana inside the backpack, PRPO Beauchamp asked Defendant to get out of the vehicle and informed him he that he was under arrest for a controlled substances violation.   PRPO Beauchamp read Defendant his Miranda rights while he was getting out of the vehicle.   Then, PRPO Beauchamp asked Defendant if there was anything else illegal inside the vehicle and Defendant answered in the negative. Defendant told PRPO Beauchamp that he could check the vehicle if he wished.   When PRPO Beauchamp was about to put Defendant in handcuffs, Defendant opened the rear driver side door of the Toyota Corolla for PRPO Beauchamp to see inside the vehicle. PRPO Beauchamp then placed Defendant in handcuffs and put him next to the door for Defendant to see when PRPO Beauchamp was going to look inside the vehicle. PRPO Beauchamp observed the back seat and the floor of the back seat.   PRPO Beauchamp did not see anything illegal at plain view at that moment.   PRPO Beauchamp then placed Defendant on the patrol car and they went to the San Juan Drug Division.

The testimony of PRPO Beauchamp is uncontested as to how Defendant was placed under arrest.   As such, and crediting PRPO Beauchamp's testimony, any search incident to the arrest which may have been performed on Defendant's vehicle was based on Defendant's consent. PRPO Beauchamp just looked at the rear back seat and floor pursuant to Defendant's invitation and consent to do so.   Nothing illegal was found in the vehicle after Defendant voluntarily opened the back door of his vehicle and invited

PRPO Beauchamp to view inside the car. Thus, any search of Defendant's vehicle at the site of the original intervention was done based on Defendant's consent.

In the alternative, and for the sake of the argument, even if illegal evidence would have been later found inside Defendant's vehicle at the time of the original intervention, the search-incident-to-arrest would have been justified under the second justification of Gant (the evidence preservation justification) under which a search incident to a lawful arrest is justified when it is "reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." Gant, 556 U.S. at 343.[9]

Circumstances unique to the vehicle context justify a search incident to a lawful arrest, as in this case, when it is reasonable to believe evidence relevant to a crime may be found in the vehicle for a motorist's privacy interest in his vehicle is less substantial than at his home.   Gant, 556 U.S. at 332; *see also* United States v. Polanco, 634 F.3d 39, 42 (1st Cir. 2011) (*citing* Thorton v. United States, 541 U.S. 615, 628, 124 S. Ct. 2127 (2004)) (the First Circuit Court of Appeals acknowledged that Gant dealt with a search-incident-to-arrest-doctrine in the vehicle context and some courts have permitted searches when the handcuffed arrestee has already left the scene).

PRPO Beauchamp testified as to the reason why Defendant's vehicle was stopped after seeing Defendant without a seat belt as explained above. PRPO Beauchamp stated that Defendant González-Seda was originally stopped for a traffic violation. However,

---

[9] The first justification of Gant (the officer safety justification) is not met because Defendant was not unsecured and within reaching distance of the passenger compartment at the time of the search.

Defendant was eventually placed under arrest for a drug offense after Defendant voluntarily handed his backpack to PRPO Beauchamp and he saw the marihuana inside. As such, the officers could reasonably have believed that evidence of the offense for which Defendant was arrested (drug offense) might be found in the vehicle and, thus, the search-incident-to-arrest would have been justified to prevent the loss of evidence. Consequently, any search-incident-to-arrest would not be unreasonable under the evidence-preservation justification of <u>Gant</u>.

As properly argued by the Government, and taking into account the unrebutted evidence presented at the suppression hearing, immediately after Defendant's legal arrest, PRPO Beauchamp could legally search the vehicle even though he did not search it at the scene but only glanced at the back seat and floor (pursuant to Defendant's consent) where nothing illegal was found. Instead, Defendant was transported to the San Juan Drug's Division where an inventory search of the vehicle was later conducted after he signed the consent form re-stating the consent Defendant orally gave at the scene of the intervention.

Thus, Defendant's request to suppress the evidence seized, based on the warrantless search of his vehicle, is without merit, under these grounds.

### D.    Inventory Search.

Defendant González-Seda argues the warrantless search of the hidden compartment under the back seat of his vehicle at the police station was illegal for lack of probable cause.   In addition, Defendant posits the search of the vehicle was a destructive

and an impermissible investigative search that exceed the scope of a legal inventory search and, therefore, violated the Fourth Amendment.

To the contrary, the Government contends the search of the vehicle at the San Juan Drug Division was an inventory search validly done pursuant to the PRPD's regulations.

"It is common practice for the police to conduct an inventory of the contents of vehicles they have taken into their custody or are about to impound." Wayne R. LaFave, *Search and Seizure* § 7.4 at 536 (3d ed. 1996 & Supp. 2003). Such inventories "are now a well-defined exception to the warrant requirement of the Fourth Amendment." Colorado v. Bertine, 479 U.S. 367, 371, 107 S.Ct. 738 (1987).   These are not treated as investigative searches because they serve three administrative purposes: "the protection of the owner's property while it remains in police custody, the protection of the police against claims or disputes over lost or stolen property, and the protection of the police from potential danger." South Dakota v. Opperman, 428 U.S. 364, 369, 96 S.Ct. 3092 (1976); United States v. Tueller, 349 F.3d 1239, 1243 (10th Cir. 2003); United States v. Haro-Salcedo, 107 F.3d 769, 772 (10th Cir. 1997).

An inventory search of an automobile is permitted where the police have lawfully impounded the automobile and the police have acted in accordance with reasonable, standard policy of routinely securing and inventorying contents of the impounded vehicle. To be permissible under the Fourth Amendment, warrantless inventory searches must be conducted according to standardized procedures. Opperman, 428 U.S. at 372-75; Bertine, 479 U.S. at 374 n. 6; Florida v. Wells, 495 U.S. 1, 4-5, 110 S.Ct. 1632, 1635-36 (1990).   Any

"discretion [must be] exercised according to standard criteria and on the basis of something other than suspicion of criminal activity." Bertine, 479 U.S. at 375; United States v. Infante-Ruiz, 13 F.3d 498, 503 (1st Cir. 1994).

Generally, "reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment." United States v. Richardson, 121 F.3d 1051, 1055 (7th Cir. 1997) (quoting Bertine, 479 U.S. at 374); United States v. Lumpkin, 159 F.3d 983 (6th Cir. 1998).

The First Circuit Court of Appeals has decided that such claim requires definite proof that the evidence would have been admitted regardless of any overreaching. Infante-Ruiz, 13 F.3d at 503-04. The Government bears the burden of showing by reference to the facts that the items would have been inevitably discovered. In addition, to be permissible under the Fourth Amendment, warrantless inventory searches must be conducted according to standardized objective procedures. Infante-Ruiz, 13 F.3d at 503. Any discretion must be exercised according to standard objective criteria and on the basis of something other than suspicion.[4]

---

[4] Nonetheless, courts have regularly approved inventory searches of impounded motor vehicles despite the absence of probable cause, see, e.g., Bertine, 479 U.S. at 371; United States v. Ramos-Morales, 981 F.2d 625, 626 (1st Cir. 1992) (collecting cases); United States v. Rodríguez-Morales, 929 F.2d 780, 785 (1st Cir. 1991); United States v. Trullo, 790 F.2d 205, 206 (1st Cir. 1986), and, by like token, courts often have held that evidence which would have turned up during an inventory search comes under the umbrella of the inevitable discovery rule, see, e.g., United States v. Seals, 987 F.2d 1102, 1107-08 (5th Cir. 1993); United States v. Horn, 970 F.2d 728, 732 (10th Cir. 1992); United States v. Williams, 936 F.2d 1243, 1248-49 (11th Cir. 1991); United States v. Mancera-Londono, 912 F.2d 373, 375-76 (9th Cir. 1990); United States v. Arango, 879 F.2d 1501, 1507 n. 2 (7th Cir. 1989); United States v. George, 971 F.2d 1113, 1121 (4th Cir. 1992) (agreeing in theory); United States v. Jenkins, 876 F.2d 1085, 1088 (2d Cir. 1989) (same); United States v. Zapata, 18 F.3d 971, 978-979 (1st Cir. 1994).

The <u>Opperman</u> Court identified three distinct interests which justify the inventory search of an automobile: 1) protection of the owner's property while in police custody; 2) protection of the police against claims regarding lost or stolen property; and 3) protection of the police from potential danger. <u>Id</u>. at 369.    Before the need to protect these interests can arise, however, the Government must have legitimately impounded the vehicle. *See* <u>United States v. Pappas</u>, 613 F.2d 324, 330 (1st Cir. 1979) ("the lawfulness of a warrantless inventory search depends on the lawfulness of the seizure of the vehicle"). [W]here a driver is arrested and there is no one immediately on hand to take possession, the officials have a legitimate non-investigatory reason for impounding the car." <u>Vega-Encarnación v. Babilonia</u>, 344 F.3d 37, 41 (1st Cir. 2003) (emphasis in original). Additionally, "law enforcement officers are not required to give arrestees the opportunity to make arrangements for their vehicles when deciding whether impoundment is appropriate," <u>Id</u>., nor must officers obtain the vehicle owner's consent prior to conducting an inventory search of an impounded vehicle. <u>Opperman</u>, 428 U.S. at 375-76.

Turning to this case, since Defendant González-Seda was under arrest, there was no one immediately on hand to take possession of the Toyota Corolla. PRPO Beauchamp explained that, due to the early hours during which Defendant was arrested, there were no tow trucks available.   As such, PRPO Beauchamp's supervisor asked him to drive the Toyota Corolla to the San Juan Drug Division. Thus, the state police officers lawfully impounded the vehicle and subsequently undertook an inventory search of the vehicle's contents in the presence of Defendant González-Seda.

The Government met its burden by introducing evidence, through the testimony of PRPO Beauchamp at the suppression hearing, as to the written consent which Defendant gave to search his vehicle and the procedure later followed while conducting an inventory search of the Toyota Corolla at the police station in the presence of Defendant.

PRPO Beauchamp testified that, once they were at the San Juan Drugs Division, he gave Defendant González-Seda a warnings document to read and, if he understood his rights, he should sign the document.   Defendant stated he understood his rights and signed the warnings document.   PRPO Beauchamp also gave Defendant the consent form, granting permission to the law enforcement officers to verify his vehicle. Defendant voluntarily and knowingly signed the consent form.

Exhibit 2 is the form which contains the warnings which were given to Defendant and his waiver of rights.   Exhibit 2 shows Defendant's initials next to each warning and Defendant's signature at the bottom. Exhibit 2 also shows PRPO Beauchamp's signature. PRPO Beauchamp testified Defendant read the form and he asked Defendant whether he understood it and he said he did and signed the form.

Exhibit 3 is the consent to search form in which Defendant voluntarily consented to the search of his Toyota Corolla vehicle. PRPO Beauchamp explained the document was signed at 6:15 am but the document states 4:10 am because 4:10 am was the time at which Defendant gave at the scene the verbal consent to search his vehicle during the original intervention.

After Defendant signed Exhibit 2, PRPO Beauchamp asked Defendant about the vehicle and whether he was telling the truth because it was registered to a female. Defendant told him he was telling the truth, that he had bought it two years ago and that it was his vehicle.   Defendant was the one who usually used the Toyota Corolla.   PRPO Beauchamp asked Defendant whether he had anything else illegal in the vehicle and Defendant answered in the negative.

PRPO Beauchamp told Defendant he had to fill out the PPR 128, which is the inventory search form of the PRPD. PRPO Beauchamp explained the PPR 128 is used to do an inventory of all vehicles that are seized during the commission of a crime, in this case, the possession of a controlled substance (marihuana). PRPO Beauchamp explained in his testimony how an inventory search is done by verifying and checking all parts of a vehicle with the owner present while filling out the PPR 128.   All parts of the vehicle are checked and opened, including all doors and compartments of the vehicle. The inventory search is a process used by the PRPD to protect the police from future complaints of items in the cars which have been seized.   PRPO Beauchamp explained the inventory search in this case was done at the San Juan Drugs Division where the cars that are seized are parked.   PRPO Beauchamp conducted the inventory search in Defendant's presence and he was standing next to PRPO Beauchamp.   PRPO Beauchamp opened the driver's side door and he checked the area.   The area was in good condition. PRPO Beauchamp opened the hood and the trunk because the handles to open both compartments were next to the steering wheel.   PRPO Beauchamp opened the rear driver's side door and it was

also "ok." Then, PRPO Beauchamp moved to the trunk.    There was a baby stroller inside the trunk along with other personal items.    The trunk had the floor carpet and the lateral ones.    When PRPO Beauchamp observed the back of the trunk, he observed something strange because the back of the trunk was flat and it is supposed to have a compartment with a division.    PRPO Beauchamp explained that when the back seat is put forward, there is a hole to access the trunk which in this case was missing.    PRPO Beauchamp testified he has knowledge of this because he has intervened with Toyota Corolla vehicles before and his family owns some Toyota Corollas. Thus, PRPO Beauchamp knows the configuration of a Toyota Corolla.    PRPO Beauchamp knocked on that area and it sounded like the metal sound he had heard before.

Exhibit 5 is a photograph of the trunk of the Toyota Corolla.

Exhibit 5A is a photograph of the trunk of the Toyota Corolla with a mark in the shape of a red circle showing the area that called the attention of PRPO Beauchamp.    The line drawn in the middle of the red circle is where the division was supposed to be.

PRPO Beauchamp testified that, while conducting the inventory search after properly impounding the vehicle, he saw something strange that was not normal in the trunk of the vehicle and the back rear seat could not be moved.    PRPO Beauchamp then went to get a fellow officer, who has experience with hidden compartments and is certified by the PRPD as such.    PRPO Beauchamp hoped this person could help him to find out whether his suspicion of a hidden compartment was genuine or not.    The other officer came and gave his opinion to PRPO Beauchamp.

Then, PRPO Beauchamp called a K-9 unit handler to bring a K-9 to check the whole vehicle. The K-9 would hit if there were drugs or firearms in the vehicle. At that time, a K-9 was brought to sniff the vehicle and the K-9 positively marked the vehicle.

PRPO Beauchamp also called the technical services unit because, if the K-9 hits positive on the vehicle, an officer of the technical services has to photograph the areas of the vehicle.

Exhibit 6A is a photograph of the Toyota Corolla which was seized from Defendant.

Exhibit 6B is a photograph of the Toyota Corolla which was seized from Defendant and where the K-9 positively hit in the Toyota Corolla.

Exhibit 6C is a photograph of the rear of the Toyota Corolla.   Defendant González-Seda can be seen in the photograph.

All photographs were taken after the K-9 positively marked the Toyota Corolla for the presence of firearms. Then, a more thorough search of the Toyota Corolla was performed of the area where the hidden compartment appeared to be.   The area of the car wiring was checked first near the steering wheel and all wiring was normal because all wires were tied together.   However, there was a cable that came out from all the other cables that ran along all through the edge of the driver seat to the back of the passenger seat and once there, it went through the middle under the rear seat.

Exhibit 7 is a photograph of the cable inside the Toyota Corolla which was outside the other cables which were tied together.

Exhibit 7A is a photograph of how said cable ran along the inside of the vehicle.

Once that cable was noticed, the rear back seat was removed. Once removed, some ammunition fell into the floor.

Exhibit 8 is a photograph of the ammunition that fell on the floor once the rear seat was removed.

Exhibit 8A is a photograph with a green circle around the ammunition that fell.

The back rest of the back seat could not be removed because it was fixed to the chassis and it had to be dismantled.   It was eventually removed through its corners. Once removed, the first thing that could be seen was a metal gray hydraulic canister. Then, the officers went to the opposite corner of the seat and separated the seat from the chassis and they observed another metal gray hydraulic canister.   The back rest was sufficiently separated, but not completely detached, when the officers observed several long weapons. Five long weapons were found inside the hidden compartment, along with some plastic bags, a deodorizing pill and more ammunition.

Defendant was present at all times during the inventory search of the vehicle. Defendant observed when the hidden compartment was found with the illegal items.

Exhibit 9A is a photograph of the edge of the back rest separated from the seat which shows the hydraulic canister on the left.

Exhibit 9B is a photograph of the edge of the car with the border of the seat lifted to the right and one of the long weapons can be seen.

Exhibit 9C is a photograph of the edge of the car with the border of the seat lifted where the hydraulic can and the deodorizing pill can be seen.

Exhibit 9D shows all the long weapons in the middle, the hydraulic canister and another deodorizing disk.

Exhibit 10 is a photograph that shows the interior of the trunk once the carpet was removed. The rear portion of the trunk turned out to be a sheet of metal which was welded to the car's frame and carpeted.

Exhibit 10A is a photograph that shows the metal sheet marked in a green circle. The area for the spare tire is marked in pink.

Exhibit 11 is a photograph of all the contraband which was obtained during the whole intervention of Defendant, to wit: 13 baggies of marihuana, 1 plastic pill bottle with marihuana, $795.00 (from Defendant's right pocket of his trousers), 5 long weapons, 122 rounds of ammunition and two magazines.

No credible evidence was presented by Defendant to contradict the fact that his vehicle was properly impounded.   No evidence was presented either to rebut PRPO Beauchamp's testimony that the proper standard procedure of the PRPD to perform an inventory search of the vehicle in this case was used and that it was within the PRPD's procedure.   Defendant González-Seda's presence during the inventory search, his consent twice to search the vehicle, coupled with the fact that the officers had previously discovered contraband in the vehicle, demonstrate that the search served at least one, if not all, of the three interests elucidated in <u>Opperman</u>.

In view of the above, the inventory search of the vehicle was properly performed and it was not destructive as Defendant's claims.

### E.  K-9 Search.

Defendant González-Seda claims in his Motion to Suppress that the warrantless K-9 inspection conducted on Defendant's vehicle after his arrest lacked probable cause because the K-9 was unreliable.

The Government contends the K-9 inspection did not require a warrant. The Court agrees.

PRPO Beauchamp testified that, while conducting the inventory search after properly impounding the vehicle, he saw something strange that was not normal in the trunk and back rear seat of the Toyota Corolla.   In addition, the officer was able to see a cable which was not tied together with the other cables which ran from the area near the steering wheel all the way to the back seat. At that time, a K-9 was brought to sniff the vehicle and the K-9 positively marked the vehicle.   A drug dog alert following a traffic stop gave officers probable cause to conduct a warrantless search of the bumper of Defendant's vehicle.   United States v. León-Sánchez, 150 F. Appx 186 (4th Cir. 2005). The Court of Appeals for the First Circuit has ruled that "the existence of probable cause based on an alert by a drug dog depends on the dog's reliability." United States v. Owens, 167 F.3d 739, 749 (1st Cir. 1999).

The Court notes that, even though Defendant had a chance at the suppression hearing, he did not present any evidence to discredit the qualifications and reliability of the K-9 which was used in this case.

As properly argued by the Government, the K-9 sniff in this case was legal because the vehicle had already been impounded and it was under the custody of the PRPD after Defendant's arrest for controlled substances. Defendant's car was transported by the police officers from the site of the traffic stop (and arrest) at Road #1 to the police station for further seizing proceedings, such as an inventory inspection (PPR-128), mentioned above. Therefore, the vehicle was under the government's custody since Defendant was arrested around 3:00 am. The K-9 sniffing performed did not fall under the Fourth Amendment, as the defense alleges, because the car was under the government custody, after properly being seized, when the canine inspection was performed during the inventory search of the vehicle.

The Court of Appeals for the First Circuit has ruled that "the canine sniff of the exterior of a vehicle which is legitimately within the custody of the police is not a search within the meaning of the fourth amendment" and that subjecting the exterior of such a motor vehicle to the olfactory inspection of a dog does not infringe upon the vehicle owner's fourth amendment rights. United States v. Rodríguez-Morales, 929 F.2d 780, 788 (1st Cir. 1991).

Moreover, as argued by the Government, a court need not determine the legality of a dog sniff if probable cause is available from an independent source. United States v. Bush, 727 F.3d 1308 (11th Cir. 2013). In this case, the PRPD agents had independent probable cause to search Defendant's vehicle due to the configuration inconsistencies observed when performing the routine inventory inspection (PPR 128). The K-9 sniff was

a corroboration method of the agents' probable cause to deeper search the vehicle for a hidden compartment.

When the PRPD officers noticed an anomaly inside the Toyota Corolla vehicle, including the back seat and the trunk's configuration, a K-9 inspection was performed to verify their suspicion of a hidden compartment.   The K-9 inspection marked positive to firearms and drugs pursuant to the testimony of PRPO López-Resto who was the K-9 handler. The K-9's positive markings were on the door of the driver's side and on the trunk of the Toyota Corolla.[10]   Based on said marking, and taking into account the totality of the circumstances, the officers conducted a deeper inspection of the vehicle as part of the inventory search.

Furthermore, in this case it can reasonably be inferred from the testimony of PRPO Beauchamp, that the justification to search the trunk and the hidden compartment was probable cause to believe that said spaces contained contraband.   PRPO Beauchamp testified there was something that was not normal including the cable which was not tied to the other cables and the back rest which was fixed and could not be moved forward.

---

[10]   Exhibit B is the Services Provided Form which was prepared by PRPO López-Resto days after July 5, 2015. The report was filled out with the notes PRPO López-Resto took and with the information provided to him after the K-9 sniffed and he left.   PRPO López-Resto clarified that the time indicated on the form of 3:00 am is when Defendant's original intervention occurred at 3:00 am in Road #1, at which time PRPO López-Resto briefly appeared at the scene and left because everything was calmed.   PRPO López-Resto testified he later arrived on the same day at the San Juan Drugs Unit at 6:00 am.   PRPO López-Resto also testified that Exhibit B mentions the Tequilón de Alex as a reference point but the K-9 search did not occur there but at the San Juan Drugs Division.   PRPO López-Resto indicated that he made a mistake in not including the San Juan Drugs Division in Exhibit B as the location where the K-9 search was done.   Exhibit 12 are the notes PRPO López-Resto took the morning of July 5, 2015. On cross-examination, PRPO López-Resto testified he does not usually include in a report of a K-9 search (such as Exhibit B) a reference to a place different to where the search in fact was done, as he did in this case.   PRPO López-Resto admitted that Exhibit B does not mention the San Juan Drug Division as the place where the K-9 search was conducted. The defense tried to impeach PRPO Beauchamp with the contents of Exhibit B and 12.   However, PRPO Beauchamp gave, during the suppression hearing, a reasonable explanation as to the contents of both documents and what the contents meant.

As such, those things caught the officers' attention.   Under the totality of the circumstances in this case, such justification was reasonable.   Defendant González-Seda was seen driving without a seat belt, other contraband was found in the backpack which was inside the car and Defendant voluntarily gave to PRPO Beauchamp to check, and Defendant was arrested for possession of a controlled substance.   The anomalies in the Toyota Corolla, which is a type of vehicle PRPO Beauchamp testified he was familiar with, could indicate to an experienced officer like PRPO Beauchamp, or other properly trained officer, the likelihood in these circumstances that contraband was hidden in the space. As a matter of fact, when the officers saw the anomalies, they gave the trunk area full attention and decided to access that are, finding the illegal firearms and the other items. No evidence has been present to rebut that this action was in conformity with the standard procedure of filling out the PPR 128.

Defendant González-Seda testified that he did see a K-9 at the original intervention at Road #1.   However, Defendant testified he did not see any other K-9 in the early morning hours of July 5, 2015. This testimony is not given any credibility inasmuch as it is considered self-serving.   Defendant's testimony as to no K-9 being present during the inventory search, which was done after the original intervention, is biased and is provided to conveniently bolster Defendant's alleged version of facts that the inventory search of the vehicle was improper.

Finally, Defendant's allegation that his vehicle was dismantled and destroyed lacks merit. No evidence was presented by Defendant at the suppression hearing that the

vehicle was dismantled, as such. The evidence presented at the hearing shows that just the back seat and the metal sheet had to be dismantled to gain access to the hidden compartment. No evidence was presented that the back seat cannot be re-installed. After all, the area of the vehicle which was dismantled had been already altered to create the hidden compartment and was not in its original condition.

In view of the foregoing, the Court finds that the K-9 search was valid and does not provide proper grounds for the request to suppress the evidence seized in the vehicle.

### F.  Consent to Search the Vehicle.

In the alternative, even if the inventory search would not have been reasonably performed and based on probable cause (matter which is denied), the search of the vehicle was reasonable and justified under the consent to search which is another exception to the warrant requirement.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. To prevail on a claim that a search or seizure violated the Fourth Amendment, a defendant must show as a threshold matter that he had a legitimate expectation of privacy in the place or item searched.  Minnesota v. Olson, 495 U.S. 91, 95, 110 S.Ct. 1684 (1990). The inquiry involves a two-part test: first, whether the defendant had an actual, subjective, expectation of privacy; and second, whether that expectation "is one that society is prepared to recognize as objectively reasonable." United States v. Battle, 637 F.3d 44, 48-49 (1st Cir. 2011); United States v.

Rheault, 561 F.3d 55, 59 (1st Cir. 2009) (*citing* Smith v. Maryland, 442 U.S. 735, 740-41, 99 S.Ct. 2577 (1979)).

Proof of valid consent to search requires that the prosecution show, by a preponderance of the evidence, that the consent was knowingly, intelligently, and voluntarily given. United States v. Marshall, 348 F.3d 281 (1st Cir. 2003).

A warrantless search does not offend the Fourth Amendment when it is properly circumscribed and stands on a voluntary consent given by a person so authorized. United States v. Chaney, 647 F.3d 401, 405-06 (1st Cir. 2011). "Consent is voluntary if it is 'the product of an essentially free and unconstrained choice.' " Chhien, 266 F.3d at 7 (*quoting* Schneckloth v. Bustamonte, 412 U.S. 218, 225, 93 S.Ct. 2041 (1973)). In determining voluntariness, the focus is often on whether the individual's will has been overborne and his capacity for self-determination critically impaired. *See* Schneckloth, 412 U.S. at 225, 93 S.Ct. 2041; United States v. Calderón, 77 F.3d 6, 9 (1st Cir. 1996).

Determining whether an individual's consent was indeed voluntary or instead the product of coercion requires a highly fact-specific inquiry dependent upon a careful scrutiny of the totality of the circumstances, rather than on a mechanical application of legal factors to a factual scenario. *See* United States v. Brake, 666 F.3d 800, 806 (1st Cir. 2011) United States v. Vanvliet, 542 F.3d 259, 264 (1st Cir. 2008); Marshall, 348 F.3d at 286. The common list of relevant fact drives for assessing whether consent was voluntary includes the person's "age, education, experience, knowledge of the right to withhold consent, and evidence of coercive tactics." Chaney, 647 F.3d at 407 (internal quotation

marks omitted); *see* United States v. Vanvliet, 542 F.3d 259, 264 n. 2 (1st Cir. 2008) (listing range of pertinent factors). While "there is no requirement that the person who gave consent must have been explicitly advised of the right to withhold it," valid consent requires "more than mere acquiescence in the face of an unfounded claim of present lawful authority." United States v. Pérez-Montañez, 202 F.3d 434, 438 (1st Cir. 2000) (*citing* Schneckloth, 412 U.S. at 234, 93 S.Ct. 2041 and Bumper v. North Carolina, 391 U.S. 543, 548, 88 S.Ct. 1788 (1968)); *see also* Ohio v. Robinette, 519 U.S. 33, 40, 117 S.Ct. 417 (1996); Chaney, 647 F.3d at 407-08; Vanvliet, 542 F.3d at 264.

Further considerations include whether the party was advised of his constitutional rights or whether the consent was obtained by coercive means.   United States v. Dunbar, 553 F.3d 48, 57 (1st Cir. 2009).

As to the validity and scope of Defendant's consent, we find that it was valid. It is axiomatic that officers must ordinarily procure a warrant before searching a locale to which Fourth Amendment protections apply. *See* Groh v. Ramírez, 540 U.S. 551, 558-59, 124 S.Ct. 1284 (2004). Several exceptions to this requirement exist, however, one of which is valid consent to search by someone having authority to give consent. *See* Pérez-Montañez, 202 F.3d at 438. In order for a consent to be valid, the Government must prove by a preponderance of the evidence that the consenting party gave it freely and voluntarily. Marshall, 348 F.3d at 285-86. The assessment of whether consent is free and voluntary is a question of fact that requires an examination of the totality of the

United States of America v. Leonard González-Seda
Report and Recommendation
Cr. No. 15-440 (FAB)
Page 35

circumstances surrounding the remolevant transaction between law-enforcement authorities and the consenting party. Pérez-Montañez, 202 F.3d at 438.

PRPO Beauchamp's testimony as to Defendant voluntarily signing the consent to search form is uncontested. Even though Defendant took the stand, he only testified as to the lack of the use of a K-9 in this case after the original intervention.   Defendant did not deny that he consented to the search of his vehicle twice. Once verbally at the site of the intervention when Defendant encouraged the officers to search the vehicle.   Secondly, Defendant consented in writing at the police station, re-affirming the prior consent to search that he verbally gave at scene.   Defendant could have declined to sign the consent form at the San Juan Drug Division but he chose to voluntarily sign the same ratifying his prior verbal consent to search.   Defendant did not present any evidence to show that both consents that he gave were not intelligent and knowing.

Exhibit 3 is the consent to search the vehicle which was duly signed by Defendant after the indicated he understood the same.

Importantly, it is uncontested that Defendant was provided with the Miranda warnings immediately when he was arrested.   Defendant did not contest in his Motion to Suppress nor in his testimony that he was provided the Miranda warnings upon his arrest.

Moreover, no allegations of coercion were included in the Motion to Suppress and none were made by Defendant during his testimony at the suppression hearing.   No evidence was presented either of Defendant being threatened or coerced; having a

diminished mental capacity or disability; being incompetent at the time or being under the influence of drugs or alcohol when he gave the consent to search.

In view of the foregoing, Defendant's two consents to search his vehicle were both knowing and voluntary.

### G. Defendant's Statements.

In Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602 (1966), the Supreme Court stated that "prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."

The provision of warnings under Miranda, although not totally dispositive, is an "important factor," as are "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances ... and, particularly, the purpose and flagrancy of the official misconduct."

In Miranda, the Supreme Court further held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Unless the government shows that the proper warnings and waiver were given, any statements made by the accused are inadmissible in evidence, unless a defendant is shown to have waived his rights under Miranda which "is made voluntarily, knowingly and intelligently." Miranda, 384 US at 444. Consequently, a statement obtained by government agents as a result of custodial

interrogation must be suppressed unless the government can demonstrate that the defendant was properly advised of his rights and that he voluntarily, knowingly and intelligently waived those rights.   United States v. Palmer, 203 F.3d 55, 60 (1st Cir. 2000).

Miranda warnings need not follow any particular format so as to avoid a ritualistic formalism requirement, as long as the substance of the rights involved is adequately conveyed.   California v. Prysock, 451 U.S. 1301, 101 S.Ct. 1773 (1981).   Even an unsigned statement goes to its weight and credibility not to its admissibility when it is proven that the defendant understood and adopted the substance of such statement.   Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407 (1963).

For a Miranda waiver to be knowing and intelligent, it must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135 (1986). However, the suspect need not "know and understand every possible consequence of a waiver of the 5th Amendment privilege." Colorado v. Spring, 479 U.S. 564, 574, 107 S.Ct. 851, 857 (1987). Rather, he need only be aware that "he may choose not to talk to law enforcement officers, and to talk only with counsel present, or to discontinue talking at any time." Id. In adhering to said legal principles, a statement is not considered involuntary unless it is procured by police coercion or trickery.   Colorado v. Connelly, 479 U.S. 157, 167, 107 S.Ct. 515, 522 (1986), accord, United States v. Byram, 145 F.3d 405, 407 (1st Cir. 1998); United States v. Santos, 131 F.3d 16, 19 (1st Cir. 1997).

United States of America v. Leonard González-Seda
Report and Recommendation
Cr. No. 15-440 (FAB)
Page 38

_____

Whether a defendant has validly waived his rights is a question to be determined by examining the totality of the circumstances in which said statement was procured and given.   Failure to warn a defendant of his rights is, when combined with police coercion, deemed significant to a finding of involuntariness.   Procunier v. Atchley, 400 U.S. 446, 91 S.Ct. 485 (1971).

When challenged statements are made by a defendant after arrest, "the degree of free will exercised by the defendant is not irrelevant in determining the extent to which the basic purpose of the exclusionary rule will be advanced by its application." United States v. Ceccolini, 435 U.S. 268, 276, 98 S.Ct. 1054, 1060 (1978) (*citing* Wong Sun, 371 U.S. at 491). After receipt of the Miranda warnings, a defendant's "choice whether to exercise his privilege to remain silent should ordinarily be viewed as an act of free will." United States v. Paradis, 351 F.3d 21, 34 (1st Cir. 2003).

In recent years, the Supreme Court has confined the voluntariness concept by holding that only confessions procured by coercive official tactics should be excluded as involuntary.   Connelly, 479 U.S. at 167.   *See* United States v. Santos, 131 F.3d at 19. "Free choice" is no longer a touchstone and the Supreme Court ruled in Connelly that a volunteered confession was admissible even if the product of a psychosis that undermined the suspect's ability to make a free and rational choice.   *See* Byram, 145 F.3d at 407-408. As such, the voluntariness of a statement would depend on whether the will of the defendant was overborne to consider that the statement was not his free and voluntary act.   This is to be resolved in light of the totality of the circumstances.   United States v.

Jackson, 918 F.2d 236, 2ful41 (1st Cir. 1990).  *See also* United States v. Marenghi, 109 F.3d 28, 33 (1st Cir. 1997).

In addition, besides Miranda concerns, for statements or confession to be admitted into evidence, within the voluntariness of same, rest on two (2) constitutional bases, to wit, the Fifth Amendment right against self-incrimination and the Due Process clause of the Fourteenth Amendment.   Dickerson v. United States, 530 U.S. 428, 433, 120 S.Ct. 2326, 2330 (2000).   There would be no violation of the Due Process clause when an examination of the totality of the circumstances -both the characteristics of the defendant and the details of the interrogation- would show the willingness to answer the questions, to speak freely, without coercion. Schneckloth v. Bustamonte, 412 U.S. at 226-27, 93 S.Ct. at 2047-2048.

As summarized by First Circuit Court of Appeals in United States v. Hughes, 640 F.3d 428 (1st Cir. 2011), when charged with determining whether a confession was voluntary, an inquiring court must sift through the totality of the circumstances, including both the nature of the police activity and the defendant's situation. *See* Arizona v. Fulminante, 499 U.S. 279, 285, 111 S.Ct. 1246 (1991); United States v. Kimball, 25 F.3d 1, 8 (1st Cir. 1994). Relevant considerations may include the length and nature of the questioning, any promises or threats made, and any deprivation of essentials (e.g., food, water, sleep, bathroom facilities) imposed upon the suspect. *See* Culombe v. Connecticut, 367 U.S. 568, 602, 81 S.Ct. 1860 (1961). They also may include an appraisal of the defendant's attributes, such as his age, education, intelligence, and mental state.

Fulminante, 499 U.S. at 286 n.2; Reck v. Pate, 367 U.S. 433, 441-42, 81 S.Ct. 1541 (1961). In short, an inquiring court must conduct the juridical equivalent of an archeological dig into the whole of the circumstances.    Hughes, 640 F.3d at 428.

Turning to the instant case, Defendant González-Seda argues, without more, that his statements should be suppressed as fruits of the poisonous tree inasmuch as they were the product of his illegal arrest and/or illegal search of his vehicle. As previously determined above, the evidence seized in this case was legally seized.    As such, Defendant's claims lack merit.

However, in an abundance of caution and for the sake of the argument, under the totality of the circumstances, and taking into the account the unrebutted testimony of PRPO Beauchamp at the suppression hearing, along with the documentary evidence introduced into evidence, it is reasonable to conclude that Defendant gave the challenged statements voluntarily after having been provided with the Miranda warnings, understanding them and knowingly signing the waiver of rights. (Exhibit 2).

Moreover, Defendant had the opportunity to testify at the suppression hearing and he only took the stand to deny the presence of the K-9 after the original intervention. Thus, no evidence was presented to support his allegations that his statements should be suppressed.    No evidence was introduced by him of the statements being involuntary, not knowing or coerced. No evidence was presented either that Defendant was tricked by the police officers when he gave his statements. Defendant did not question the length and nature of the interrogation nor did he argue that any promises or threats were made.

Defendant did not testify that he was deprived of essentials such as food, water, sleep and/or bathroom facilities.   No evidence was brought either of Defendant having a diminished mental capacity or disability, being incompetent at the time or being under the influence of drugs or alcohol when he waived his rights and made the incriminating statements.

On the contrary, as testified by PRPO Beauchamp, Defendant's statements were voluntarily made after being advised of his rights and knowingly waiving them in writing. Evidence of this is Exhibit 2 which is the waiver of rights signed by Defendant, acknowledging that he was informed of his Miranda rights, understood them and decided to make statements thereafter.   PRPO Beauchamp testified that, after Defendant was arrested, and prior to being interviewed, he was provided with his legal warnings and rights in writing, Defendant read his rights, understood them, waived them and then voluntarily decided to make some statements.

As such, Defendant's allegations that his statements were induced by Fourth Amendment violations are unfounded.   Suppression on these grounds also fails.

## CONCLUSION

In view of the foregoing, it is recommended that Defendant González-Seda's "Motion to Suppress Evidence Obtained without Probable Cause" (Docket No. 54) be DENIED.

IT IS SO RECOMMENDED.

The parties have fourteen (14) days to file any objections to this report and recommendation.   Failure to file same within the specified time waives the right to appeal this order.   Henley Drilling Co. v. McGee, 36 F.3d 143, 150-151 (1st Cir. 1994); United States v. Valencia, 792 F.2d 4 (1st Cir. 1986).   *See* Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 991 (1st Cir. 1988) ("Systemic efficiencies would be frustrated and the magistrate's role reduced to that a mere dress rehearser if a party were allowed to feint and weave at the initial hearing, and save its knockout punch for the second round").

In San Juan, Puerto Rico, this 28th day of April of 2016.

s/CAMILLE L. VELEZ-RIVE
CAMILLE L. VELEZ-RIVE
UNITED STATES MAGISTRATE JUDGE